SINCLAIR REFINING CO., APPELLEE, *v.* MAY BROS. OIL CO., APPELLANT.

(No. 1239—Decided April 17, 1963.)

*Mr. F. W. Gooding*, for appellee.
*Messrs. Meredith, Meredith & Tait*, for appellant.

*Per Curiam.* This is an appeal on questions of law from a judgment of the Common Pleas Court in favor of the plaintiff, Sinclair Refining Company, and against the defendant, May Bros. Oil Company.

It appears undisputed in evidence that on or about August 14, 1957, the plaintiff, as lessee, and the defendant Arnold, as lessor, signed and executed a lease for a term of ten years providing, among other things, that Arnold was to construct an automobile service station on the tract of land described in the lease and that plaintiff was to furnish certain improvements and equipment to be utilized in the operation of the service station. The lease never became effective, for its execution and delivery was made on the express condition that it should not become effective or binding upon Arnold unless he would be successful in obtaining a loan of $30,000 from The Citizens National Bank of Bluffton, Ohio, on the security of the leased premises. Notwithstanding this conditional execution and delivery, Arnold went forward with the construction of the service station and the plaintiff furnished and installed all the tanks, pumps, piping, wiring, hoists, air compressors, and other equipment customarily used in the operation of a service station, together with necessary concrete work, at a cost to plaintiff alleged to be $12,112.65, and the station was opened for business by Arnold, as operator, in November of 1957.

By letter of August 21, 1957, Arnold was advised by The Citizens National Bank of Bluffton that it would not loan the

amount of $30,000 to him unless Sinclair would unconditionally guarantee rent payments, and when plaintiff Sinclair did not do so, or provide other financing, Arnold thereupon notified plaintiff by letter dated December 10, 1957, that the lease of August 14, 1957, was null and void and that the plaintiff should remove from the premises immediately any property which plaintiff might have thereon.  By letter of the same date, defendant May Bros. notified plaintiff that it had signed Arnold to its petroleum supply contract and requested plaintiff "to invoice us for what equipment you have installed at this location at recognized prices and authority to begin delivering into the equipment within ten days."  May Bros. thereupon disconnected plaintiff's distinctive pumps from the service islands and installed its own.  Thereafter, Sinclair picked up these pumps and other unattached equipment which May Bros. would not be using in its operation, and Arnold, as operator, resumed operating the service station with May Bros. as his supplier.  Arnold's relationship with May Bros. was formalized further by a written lease from Arnold to May Bros., executed under date of February 6, 1958, which lease is not in evidence but is not disputed.

In response to May Bros.' letter of December 10, 1957, Sinclair, under date of February   , 1958 (*sic*) sent to May Bros. its debit memorandum itemizing the equipment installed by it on the premises, with the price stated as to each item.  At the end of the memorandum appears an item, "original equipment inst. cost covered on SOX-6991 $7421.27," and the total of the memorandum is in the amount of $12,112.65.  The debit memorandum has a rubber stamped notation thereon that "upon payment of this invoice Sinclair Refining Company conveys and assigns all its title and interest in and to the equipment herein described, as is, in its present condition and without any warranty of fitness for any purpose or any other warranty of any kind."

On May 6, 1958, May Bros. mailed plaintiff a check for $3,981.28, with attached voucher listing all items for which payment was being made in conformity with the price for each item set forth in plaintiff's invoice.  The check was forwarded with a letter from May Bros. which stated, "Enclosed find our check for $3981.28 for the various items of equipment located at the

Arnold service station at Beaverdam, Ohio. On the items not included by this check the equipment has either been picked up by your company or they are at the above station. You will note that the amounts of each item checks with those shown on your invoice dated February 5th, 1958 No CB-17. *This settlement is in accordance with recognized prices between major oil companies.*" (Emphasis added.) This check was cashed by plaintiff on May 9, 1958, and paid by the bank upon which it was drawn on May 14, 1958. The record does not reveal any communication from plaintiff to May Bros. after receipt of the check until plaintiff's letter of July 1, 1958, under the signature of its attorney, notifying May Bros. that an unpaid balance was due for installation charges in the amount of $12,112.65.

It appears from the prayer of plaintiff's petition, and from a pre-trial stipulation, that plaintiff's action is based upon the equiptable principle of unjust enrichment, upon the claim that May Bros. was unjustly enriched to the extent of installation costs incurred by Sinclair and not paid for by May Bros., and the same was tried to a three-judge court upon this claim. At the conclusion of plaintiff's evidence, and upon his motion, a verdict was directed in favor of defendant Arnold. The case proceeded against May Bros. as the only defendant, and after the receipt of all the evidence, including that hereinbefore and that hereinafter referred to, the court rendered its judgment in favor of the plaintiff in the amount of $5,324.95. It is from this judgment that the defendant May Bros. has perfected its appeal to this court.

Appellant's first two assignments of error may be summarized that the judgment is not sustained by the evidence, is manifestly against the weight of the evidence, and is contrary to law.

Sinclair and May Bros. each produced evidence to show, and it is conceded, that there exists in the gasoline distribution industry a well-established custom and practice for the gasoline supplier to furnish to the station operator and install all the tanks, pumps, compressors, hoists and incidental equipment necessary for the furnishing of gas and lubrication services, and that when the station operator changes from one supplier to another the first supplier will invoice the second supplier for all non-distinctive equipment which the second supplier can utilize

in its operation of the service station, the invoice prices of such equipment following, to the extent scheduled, schedules of prices which each company has adopted for its use in buying or selling such equipment and in completing the transfer thereof. The schedules adopted and followed by plaintiff and other major oil companies were placed in evidence and, subject to certain exceptions not applicable here, also in conformity with the established customs and practices of the industry, the schedule prices include all the costs incurred by the seller in the installation of the equipment, i. e., for pipes, fittings, wiring, labor, freight, etc. The prices in the schedules adopted by different gasoline suppliers will for the same items of equipment vary to some slight extent in amount. In the event that the invoiced prices furnished by the selling first supplier to the buying second supplier are found to be acceptable by the latter (usually when in reasonable accord with the latter's own price schedule) then the latter will pay the invoiced price and title to the equipment will thereupon pass. If not acceptable further negotiations will ordinarily occur and if the parties can not then reach agreement it is necessary for the first supplier to dig up his tanks and remove his equipment and for the second supplier to install his own tanks and equipment. This custom and practice of buying and selling at scheduled prices has developed in the industry for the sole purpose of avoiding this last eventuality as it is wasteful and to no supplier's gain for the first supplier to be put to the expense of removing and the second supplier to be put to the expense of then installing that which, for practical purposes, is identical equipment.

It cannot reasonably be disputed that it is with reference to these customs and practices that May Bros. requested in its letter of December 10, 1957, to be invoiced for installed equipment "at recognized prices," and that it tendered payment by its letter of May 6, 1958, as settlement "in accordance with recognized prices between major oil companies."

Sinclair's claim, however, is that although the customs and practices of the industry in this regard are applicable to sales of equipment by a supplier who has installed same when such supplier has been supplying gas and oil for a period of years whereby the supplier has been able to recoup its installation costs through profits on its sales, the customs and practices

in this regard are not here applicable because Sinclair never obtained a lease on the premises and supplied gas and oil for too short a period of time to permit recoupment of these costs, and that, under such circumstances, for May Bros. not to pay Sinclair for the amount Sinclair expended in installation would constitute unjust enrichment of May Bros. at the expense of Sinclair.

In our opinion, however, there is no evidence to support a finding of unjust enrichment, as the parties have resolved their differences on a purely contractual basis.

May Bros. letter of December 10, 1957, constituted neither an offer nor an acceptance, but instead constituted an invitation by May Bros. for Sinclair to make an offer to May Bros. in conformity with the customs and practices of the industry by forwarding to May Bros. its invoice for the installed equipment. At this point Sinclair had the option to remove all its installed equipment at its own cost of removal or to attempt to consummate a sale to May Bros. May Bros., at this point, had a similar option, to install similar equipment at its own cost of installation or to attempt to arrive at an agreement of purchase with Sinclair.

Sinclair by sending its invoice to May Bros. chose to offer to sell such installed equipment listed therein to May Bros. at the total price in the invoice, which price would, of course, reimburse Sinclair in full for its expenses of installation. At this point May Bros. had several alternatives, (1) to accept Sinclair's offer, (2) to decline the offer, insist upon Sinclair removing its equipment at Sinclair's expense, and to install its own equipment at May's expense, or (3) to decline the offer and to negotiate further with Sinclair.

May Bros. chose the last alternative and its letter and check of May 6, 1958, constituted a counteroffer to Sinclair to settle their differences for the amount of the check. The letter specifically stating that "this settlement is in accordance with recognized prices between major oil companies," and it being the custom and practice of the industry that these prices included all installation costs, there can be no doubt either as to May Bros. intent in making this reference in this counteroffer or as to Sinclair's understanding of same. Thereupon, Sinclair had three options, either (1) to decline the counteroffer and re-

move its equipment at its own expense, (2) to decline the counteroffer and negotiate further with May Bros., or (3) to accept May Bros.' counteroffer. Under these circumstances, by accepting and cashing the check Sinclair accepted the counteroffer and all the differences between the parties as to the equipment to which the counteroffer referred thereby became liquidated, satisfied, and settled, and title to such equipment passed to May Bros. Sinclair saved itself the expense of removing the equipment and May Bros. saved itself the similar expense of installing like equipment. May Bros. did not receive from Sinclair any benefit for which it did not compensate Sinclair by good and valuable consideration pursuant to a freely negotiated contract of sale, and the judgment of the trial court in favor of Sinclair, on the theory of unjust enrichment or otherwise, is not sustained by the evidence, is manifestly against the weight of the evidence, and is contrary to law.

For these same reasons appellant's fourth, sixth and seventh assignments of error are well taken.

Appellant's third assignment of error, that the "Court of Common Pleas erred in overruling defendant-appellant's motion to dismiss the petition and render judgment in its favor at the close of plaintiff-appellee's evidence," was waived by the appellant proceeding with the introduction of its evidence after such overruling and, for such reason, is not well taken.

Appellant's fifth assignment of error, that the court "erred in overruling defendant-appellant's motion requesting the court to state in writing, its conclusions of fact found separately from its conclusions of law," is not well taken for the reason that such motion was not timely filed. Appellant was not required to wait for the court's decision to make such motion and it could have been made at least as early as the submission of the case to the court after trial.

For the foregoing errors, which were prejudicial to the appellant, the judgment of the trial court is reversed and final judgment entered for the defendant May Bros. Oil Company.

*Judgment reversed.*

MIDDLETON, P. J., YOUNGER and GUERNSEY, JJ., concur.